IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

CHARLES MEREDITH,

        Plaintiff,

     Vs.                       No. 12-1042-SAC

MICHAEL J. ASTURE,
Commissioner of Social Security,

        Defendant.


MEMORANDUM AND ORDER

This is an action to review the final decision of the defendant Commissioner of Social Security ("Commissioner") denying the claimant Charles Meredith's applications for disabled adult child benefits under Title II of the Social Security Act ("Act") and for supplemental security income ("SSI") under Title XVI of the Act. With the administrative record (Dk. 10) and the parties' briefs on file pursuant to D. Kan. Rule 83.7.1 (Dks. 11, 16 and 17), the case is ripe for review and decision.

**STANDARD OF REVIEW**

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that the commissioner's finding "as to any fact, if supported by substantial evidence, shall be conclusive." The court also reviews "whether the correct legal standards were applied." *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Substantial evidence is that which "a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Persales*, 402 U.S. 389, 401 (1971) (quotation and citation omitted). "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). The review for substantial evidence "must be based upon the record taken as a whole" while keeping in mind "evidence is not substantial if it is overwhelmed by other evidence in the record." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks and citations omitted). In its review of "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, . . . [the court] will not reweigh the evidence or substitute . . . [its] judgment for the Commissioner's." *Lax*, 489 F.3d at 1084 (internal quotation marks and citation omitted).

The court's duty to assess whether substantial evidence exists: "is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.'" *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (quoting *Fulton v. Heckler*, 760 F.2d 1052, 1055 (10th Cir. 1985)). At the same time, the court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Lax v. Astrue*, 489 F.3d at 1084 (internal quotation marks and citation omitted). The court will

"meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been made." *Wall v. Astrue*, 561 F.3d at 1052 (internal quotation marks and citation omitted).

By statute, a disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A).

A five-step sequential process is used in evaluating a claim of disability. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The first step entails determining whether the "claimant is presently engaged in substantial gainful activity." *Wall v. Astrue*, 561 F.3d at 1052 (internal quotation marks and citation omitted). The second step requires the claimant to show he suffers from a "severe impairment," that is, any "impairment or combination of impairments which limits [the claimant's] physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (internal quotation marks and regulatory citations omitted). At step three, the claimant

is to show his impairment is equivalent in severity to a listed impairment. *Lax*, 489 F.3d at 1084. "If a claimant cannot meet a listing at step three, he continues to step four, which requires the claimant to show that the impairment or combination of impairments prevents him from performing his past work." *Id.* Should the claimant meet his burden at step four, the Commissioner then assumes the burden at step five of showing "that the claimant retains sufficient RFC [residual functional capacity] to perform work in the national economy" considering the claimant's age, education, and work experience. *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010) (internal quotation marks and citation omitted). Substantial evidence must support the Commissioner's showing at step five. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993). The evaluation at steps four and five makes use of the agency's RFC assessment. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). To meet his burden at step five, the Commissioner may rely on the Medical–Vocational Guidelines (grids). 20 C.F.R. Part 404, Subpt. P, App. 2. *Williams v. Bowen*, 844 F .2d 748, 751 (10th Cir. 1988).

**PROCEDURAL HISTORY**

After a hearing at which Charles Meredith was represented by counsel, the administrative law judge ("ALJ") issued her decision on July 29, 2010. (R. 40-48). To receive disabled adult child benefits, Meredith must prove he became disabled before October 6, 2003, the date he turned the age of 22.

4

At step one, the ALJ found that because of limited work activities and insufficient income levels, Meredith had not engaged in substantial gainful activity throughout the relevant periods. (R. 42). At step two, the ALJ found Meredith had the following severe impairments of "attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), anxiety, depression, learning disorder, and some history of substance abuse." (R. 43). The ALJ found at step three that Meredith's impairments did not meet or equal a listed impairment. (R. 44-45). At step four, the ALJ determined that Meredith's RFC consisted of "no exertional deficits," but with "mental restrictions" and limitations to "understanding, remembering, and carrying out simple tasks" and an ability "to work better with things as compared to people and . . . in an environment that requires infrequent contact with people. (R. 45). Finding no past relevant work, the ALJ also determined that Meredith had a limited education but did have the ability to communicate in English. Based on the testimony of a vocational expert, the ALJ found that there are jobs existing in significant number in the national economy that Meredith could perform. (R. 46-47). Therefore, the ALJ concluded the plaintiff was not disabled throughout all relevant periods. (R. 47).

**FACTUAL BACKGROUND**

Meredith was born on October 6, 1981. His earliest medical record evidence starts in September of 1995 with a clinical note showing a history of

ADHD:   "Patient is eager to work towards a better academic performance, but at the same time, he continues very distractible, impulsive, and inattentive." (R. 619). The physician prescribed a change in medications and subsequently noted an improvement in mental status. (R. 620). In February of 1999, he was prescribed an anti-depressant for "significant mood swings, depression, anxiety" with worsening school performance. (R. 464).

And in May of 1999, the school psychologist completed a comprehensive evaluation report on Meredith as part of his special education programming. It was noted that he was receiving psychological treatment for depression and anxiety but that the anti-anxiety medication had not been "highly effective in relieving his symptoms." (R. 330). His academic skills were "well below average" in mathematics and written language. He missed "a great deal of school." *Id*. He was failing his special education classes largely due to poor attendance. It was observed that Meredith was "struggling with emotional issues and ongoing treatment" was being provided and that his educational program would be "focused on providing GED preparation." (R. 331). Meredith never earned sufficient credits to graduate from high school.

Beginning in the summer of 2002, Meredith was treated for symptoms of depression, mania, stress, and insomnia. He was discharged in November of 2002, after dropping out of treatment and missing seven of his 13 appointments. His GAF on discharge was 58, and the written follow-up

6

recommendation notes included:    "At last contact Charles was employed and doing well," and "No follow up treatment is recommended at this time." (R. 590).

Meredith returned to Valeo in early 2006 with reports of dramatic moods, depression, manic symptoms, and inability to sleep. The initial assessment included impressions that Meredith "presents with bipolar disorder and PTSD." (R. 586). He was referred for therapy and medication. The only medical record regarding this referral is a Valeo progress note dated April 10, 2006, that summarizes a telephone call from Meredith:

> Client called concerning being denied for disability, wanted clarification of his diagnosis, is Bipolar Disorder NOS. Client states he is receiving GA and Food stamps but it is not enough to live on. Reports someone told him not to work, but is unsure who that was. Encourage client to get clarification from Disability Determination Services on whether he can work part time or not and that he may want to work on improving his mental health by attending therapy and medication services. Reports he has an appointment scheduled with Valeo on 5-3-2006 but is unclear with whom and for what reason.

(R. 581).

In March of 2007, Meredith returned to Valeo to "re-establish mental health services" with reports of increased family conflicts, anxiety, and difficulty with "focusing, sleeping and maintaining employment." (R. 374). The mental status exam revealed a number of symptoms. (R. 377). The initial treatment plan had a diagnosis of PTSD chronic and a GAF of 60. (R. 379).

Meredith began seeing Jean Koch, ARNP at Valeo, on March 21,

2007. (R. 407). The notes from this visit mention Meredith experiencing panic attacks and having many jobs that he "impulsively quits" after six months. *Id.* Some medications were prescribed. Meredith was next seen by Koch on April 19, 2007, with reports of sleeping better, improved mood, and employed again and with good progress toward the objectives of less anxiety and leveling out mood swings. (R. 405).

On May 1, 2007, Meredith started therapy with Regina Van Reis, a MSW intern at Valeo. Ms. Van Reis noted nothing unusual in the Meredith's functioning and also noted that Meredith was "working on G.E.D. and is going to a job orientation today." (R. 404). At the next weekly therapy session, Ms. Van Reis again noted good progress on goals, nothing unusual in Meredith's functioning, and observed Meredith was setting goals for improving self-esteem and for maintaining employment. (R. 403). Meredith did not show for his appointment with Ms. Koch on May 31, 2007. (R. 402).

On July 5, 2007, Meredith returned to Ms. Van Reis complaining of being tired from not sleeping for two days and of cutting his medication doses in half because his supply was "about out." (R. 401). The progress note from this visit showed "fair progress" with poor hygiene, distractible cognition and tangential thinking. *Id.* Records show Meredith did not show up for his appointments on July 17 or July 23. (R. 399, 398).

On August 1, 2007, Meredith returned to Ms. Van Reis reporting

"increased financial anxiety" and depression after having being terminated from two jobs since his last session. (R. 397). Meredith discussed being motivated to obtain his GED and how this would help with the job situation. Meredith was observed to have distractible cognition, elevated mood, and tangential thought. *Id.* On this date, Ms. Van Reis also reviewed Meredith's treatment plan noting fair progress with the objectives of increasing self-esteem, stabilizing mood swings, and lowering anxiety. (R. 368). It was also noted that Meredith struggles with low self-esteem and that he recognizes steady employment improves his self-esteem as shown by his recent 90-day period of employment although not with the same employer. *Id.* He was continued on psychotropic medications.

On August 21, 2007, Meredith was seen by ARNP Jean Koch for "medication recheck." (R. 395). Meredith observed good progress in lowering anxiety and leveling out the mood swings. While Meredith appeared nervous and anxious, Koch noticed an improved mood, judgment and anxiety. Meredith and Koch agreed that increasing the Lamictal to 300 mg. could improve anxiety. *Id.* Meredith was excited about starting a new job in customer service in September. They scheduled the next appointment for two months.

Valeo records show Meredith's mother leaving a telephone message on September 19 and 20, 2007, that her son needed his medications refilled. Valeo personnel spoke with Meredith on September 24, 2007, noting

9

that he wanted "to re-start Lamictal now." (R. 394). A message was left for Meredith that a starter pack of meds could be picked up at the front desk. Meredith failed to show for his appointment on October 23 with Jean Koch. (R. 392).

On November 14, 2007, Meredith was seen by ARNP Koch for medication re-check. (R. 381). Koch noted again good progress on stated objectives but also observed depression, anxious and tangential thoughts. She noted that Meredith's attitude had resulted in a suspension from his job. Meredith told Koch that he had reduced his dosage of Lamictal to make it last but that he had noticed a definite change with the lower doses and his need for this medication. Meredith resumed his higher doses of Lamictal and his other medication for sleeping. He scheduled his next appointment with Koch in two months.

A medication re-check on January 8, 2008, with Koch showed Meredith to have fair progress with mood leveling but with observations of a depressed mood and anxious affect. (R. 390). He was "down" due to his grandmother's recent death and family issues. His next appointment was scheduled in one month, but he did not show. (R. 390, 389).

Meredith arrived early for his medication re-check on March 20, 2008, and the notes indicate fair progress and an anxious mood. (R. 388). ARNP Koch recorded that vocational rehabilitation was asking Meredith to

participate and that a related form was completed. Meredith also told Koch that he planned to resume therapy as it had been helpful. His next appointment was scheduled in two months.

At his medication recheck on May 15, 2008, Koch recorded fair progress, no remarkable objective findings, and poor insight. Meredith reported new episodes of ending up somewhere and not knowing how he got there. Koch also noted:

> He is functioning from day to day—lives with his lover who is on disability. He presents as alert and oriented—verbally adept at describing symptoms with no distraction or noticeable disorganization. Reports that SRS has told him to get a job. He is focused on getting disability and does not believe he can get a job. I do not have a clear indication of whether this is true or not and asked him if they have done any neuropsychological testing—he states no. He continues to believe that the medication helps him to feel better and wishes to continue it.

(R. 387). The next appointment is scheduled for two months.

On July 10, 2008, ARNP Koch reports fair progress, pressured speech and poor insight. (R. 386). Meredith is excited about a new job and talked about completing his GED. He has had some mood fluctuation "but it is nothing that lasts long." *Id*. His medications were continued, and his next appointment is scheduled for three months later. Valeo's medication log shows Meredith received a refill of Lamictal in November of 2008, but the court has found no record of that visit. (R. 578). Meredith did not show for his appointment scheduled in January of 2009. (R. 576).

On February, 11, 2009, ARNP Jean Nelson, (f/k/a/ Jean Koch),

11

observed depressed and anxious mood and recorded that the Meredith was reporting an increase in irritability and mood swings. (R. 573). Nelson noted that Meredith's medication compliance was "fair" and added a prescription of Lexapro for anxiety and depression. (R. 574). Nelson included a GAF of 60. (R. 575). Meredith's appointment for March 10, 2009, was cancelled. (R. 570).

Meredith was seen by Nelson on March 25, 2009, with notations of "fair progress" on objectives but presenting with an anxious mood, mood swings and irritability. (R. 567). Meredith discontinued the Lexapro because of side effects. Nelson again noted "fair" compliance with medication and a GAF of 60. (R. 568). His next appointment was scheduled for six weeks.

Meredith resumed individual psychotherapy at Valeo on April 13, 2009, seeking to improve his self-confidence and self-respect. (R. 565). He reported severe symptoms of depression, difficulty in sleeping, conflicts, inability to do tasks, and feeling overwhelmed, *Id*. He also reported moderate symptoms of anxiety and anger. Ms. Endsley, MSW intern, recorded a GAF of 60. (R. 566). On her separate treatment plan, Ms. Endsley recorded that Meredith was "experiencing recent job loss w/ independent kennel operator" and had stress related to that job in "putting down some of the dogs." (R. 562). Ms. Endsley noted Meredith's desire to improve "stability." *Id.* Ms. Endsley cancelled the therapy session scheduled for the next week and noted that she would wait for Meredith to call and reschedule. (R. 559).

12

On May 7, 2009, ARNP Nelson saw Meredith for medication management noting fair progress, poor hygiene, depression and irritability "being manageable," and "many conflicted relationships." (R. 556). She also noted that Meredith was "looking for work, manipulative traits but pleasant and cooperative." (R. 557). She assessed a GAF of 60 and scheduled the next appointment in three months.

Meredith continued his therapy sessions with Endsley. In one session, he discussed his learning disability with reading and having applied unsuccessfully for SSI two times. Ms. Endsley noted that she would check into testing at Valeo, as it appears the learning disability was affecting Meredith's efforts to obtain a GED. (R. 552). In May of 2009, Meredith reported severe symptoms of depression, anxiety, conflicts, inability to finish tasks and feeling overwhelmed. *Id.* On June 22, 2009, Meredith reported his symptoms of depression and anxiety were moderate and but still a severe symptom of feeling overwhelmed. (R. 546). From April 13, 2009, to July 13, 2009, Meredith attended five therapy sessions, failed to show for two sessions, and had two sessions cancelled. (R. 541). His GAF score remained 60 and the treatment plan on July 13th showed "good" progress. (R. 540).

On July 30, 2009, Meredith was seen by Nelson for medication management. (R. 533). Meredith requested a medication change to address increased irritability and anger. Nelson observed an anxious mood. She

discontinued Lamictal and prescribed Trileptal.

After missing several therapy sessions, Meredith returned to Endsley on August 4, 2008, with reports of moderate symptoms of depression, anxiety, angry, inability to sleep and finish tasks. (R. 529). He explained the missed appointments on not taking his medication, lack of sleep and relationship problems. Meredith indicated he was not employed and struggled to get up for appointments. Meredith told Endsley that "he does not think he can hold a job" and has been fired from several jobs. (R. 529). Endsley scheduled Meredith for testing with Jessica Duckers at Valeo.

On August 17, 2009, Jessica Duckers, LMLP, administered the MCMI-III (Personality Inventory), the WAIS-IV (IQ test), WRAT4 (achievement test) and CAI-A (ADHD inventory). (R. 525). Meredith told Duckers that he was not currently employed as his last job ended when his "employer went to jail" but that he was looking for work. (R. 525). Duckers observed that Meredith was "respectful and cooperative with the testing process" and "showed adequate ability to attend to test items." *Id.* Duckers noted, "Unfortunately on the MCMI his pattern of responding indicated exaggeration of experienced Sx as more severe than really the case. It could also be interpreted as a cry for help, but interpretation is cautioned as profile was considered invalid." *Id.* As far as the other testing, Duckers observed that Meredith appeared to give "best effort on the tasks." *Id.* She provided a written

14

report dated October 7, 2009, that discusses the test results along with these

conclusions:

> Mr. Meredith's history of instability in the home and at school seems to strongly account for the history of disruptive behavior or ADHD type symptoms, as well as the lower level of intellectual functioning. . . . It is no surprise that Mr. Meredith has struggled through his adult life. The results continue to support the current primary diagnosis of Posttraumatic Stress Disorder and the emotional dysregulation, behavioral issues are easily accounted for by this diagnosis. However, given report of depressive symptoms, it may be helpful to include a diagnosis of Dysthymic Disorder to tailor treatment planning. . . .
>
> Though Mr. Meredity's WAIS-IV scores fall in the Mild Mental Retardation range of functioning, it is not believed that he carries this diagnosis. He has demonstrated strengths such as working one year at a customer service job, using a computer, and assuming caretaking duties for his partner. He also has adequate language comprehension and with support and training, Mr. Meredith may be able to communicate his needs effectively. Mr. Meredith will still likely struggle with tasks involving concentration, focus, short term memory and activities requiring speed and efficiency as a result of continued PTSD symptoms (intrusive memories, poor concentration). He may have to study in smaller chunks, do his coursework in a place relatively free of distractions, and to take planned breaks. Mr. Meredith was strongly encouraged to pursue his high school diploma then seek out training or employment. Special consideration would be need for Mr. Meredith's difficulties with spelling and mathematics. He would likely do best in a supportive job environment where quality of work and relationships are valued over speed or quantity—a position where he can help others as he is a sensitive, seemingly caring individual.
>
> Ongoing therapy is essential for Mr. Meredith given the chronic PTSD symptoms and impairment in work and social functioning, to be able to interact appropriately with employment staff.

(R. 420).

Apparently before leaving Valeo, Endsley prepared a treatment

plan for Meredith dated August 31, 2009, in which she recorded "good"

progress and a GAF score of 60. (R. 519). On September 15, 2009, Meredith

15

began therapy with Jamie Nellans, a MSW intern at Valeo. (R. 515). Nellans observed poor hygiene and a depressed mood. Meredith expressed a desire to "become more self-sufficient but his moods and poor sleep cycle are an obstacle in finding and sustaining employment." (R. 515).

On a medication check appointment with Paula Wilson RNC, on September 16, 2009, Meredith noted "not much difference in irritability and mood" with the new prescription, but he did "feel goofy and spacey for a couple hours after" taking it. (R. 512). His medications were not changed, his GAF score was 60, and his appointment was scheduled for 5 weeks with Nelson.

At his next therapy session on September 22, 2009, Meredith appeared with poor hygiene and distractible thoughts and shared at length his conflicted relationship. (R. 508). His GAF score was 60.

After missing three appointments to discuss his testing results with Ms. Duckers, (R. 510), Meredith met with her on September 28, 2009. (R. 505). She included portions of this discussion in her written report regarding employment issues. She noted nothing unusual in his functioning and recorded his GAF as 60. (R. 505-506).

On September 29, 2009, Meredith called his therapist just two hours before his appointment to say he did not have enough gas to make the appointment. (R. 503). Meredith cancelled the therapy session scheduled for October 8, 2009, stating a conflict with another medical appointment. (R.

16

501). He was not billed for this session, as he cancelled more than 24 hours earlier. On October 25, 2009, he called just ten minutes before his therapy session saying he had forgotten the appointment and asked to reschedule it. (R. 499). He was billed for the session. On November 3, 2009, Meredith made his therapy appointment presenting with poor hygiene, anxious, distractible thoughts and with problems of increased hours of sleep, racing thoughts, and feeling overwhelmed. (R. 497). Nellans had scored his symptoms at 25 on September 16, 2009, and on November 3, 2009, she scored them at 24.

On November 11, 2009, Meredith attended an informational meeting at Valeo involving group therapy and was invited to attend the next week's session. (R. 495). At his individual therapy session on November 17, 2009, Meredith's symptom score was 26 presenting with "sadness, depression, worry, anger, conflicts with partner and family, racing and paranoid thoughts, unable to complete ADL's." (R. 493).

At his medication management check with Nelson on November 23, 2009, the stated objective was to alleviate depression and keep appointments with progress noted as "poor." (R. 490). Meredith expressed that the Trileptal was "too sedating" and that it had not improved his anger, irritability or depression. *Id*. The Trileptal was discontinued, and a prescription for Effexor was started. His next appointment was scheduled for one month. His GAF score was not changed from 60.

17

On November 25, 2009, Meredith attended his first group session and his group behavior ratings were "good." (R. 486). He attended a second group session on December 2, 2009, with similar ratings, (R. 482). On December 9, 2009, however, he left a message that he would not be continuing with group therapy, as it "just one more thing to worry about." (R. 480).

On December 1, 2009, Meredith attended his individual therapy session, and Nellans scored his symptoms as 23. (R. 484). He presented with problems of depression, overwhelmed, racing thoughts and unable to complete ADL's. There was some discussion of payment issues and a fee appeal, and Nellans discussed the "crisis services available." (R. 484). The next appointment would not be scheduled until the fee appeal had been made.

On December 15, 2009, Meredith was seen by Nellans who scored his symptoms as 24. (R. 478). He told her of thoughts about hurting himself and believed these thoughts were related to medication change. He stopped all medications, and his next appointment with ARNP Nelson was scheduled for December 22, 2009. Nellans took Meredith to Crisis for a consult.

On December 22, 2009, Nelson saw Meredith for his medication management check. (R. 473-44). His prescription for Effexor was discontinued, and he was prescribed Seroquel again. His medication compliance was noted as poor, as was his progress. He presented as nervous,

18

depressed and anxious. His GAF score remained at 60. (R. 475). His next

appointment was scheduled for four weeks. He returned on January 20, 2010,

and reported some improvement in anger but still "real down" and stressed by

life. (R. 470). He did not make his appointment in February of 2010. (R. 469).

On March 23, 2010, Valeo contacted him stating that he was not

eligible for further therapy sessions until his balance was paid and he had

attended three group sessions to determine ability to keep appointments. (R.

467). He was told to keep his medication appointment on March 29th and of

the availability of crisis services. Meredith did not show for his medication

management appointment on March 29th. (R. 466).

Nelson completed a medical source statement-mental on May 3,

2010. (R. 622-623). Nelson checked off boxes indicating the effects of

Meredith's mental impairments. She marked 9 of 20 categories of mental

functioning as moderately limited and 8 of 20 categories as markedly limited.

*Id.* Those markedly limited categories included: "[t]he ability to perform

activities within a schedule, maintain regular attendance and be punctual

within customary tolerances," "[t]he ability to complete a normal workday and

workweek without interruption from psychologically based symptoms and to

perform at a consistent pace without an unreasonable number and length of

rest periods," and "[t]he ability to accept instructions and respond

appropriately to criticism from supervisors." *Id.*

At the hearing on June 18, 2010, Meredith testified to not passing the GED despite five attempts. His longest employment was six months at Taco Tico, and he had failed a customer service job with Sprint. He experiences frequent flashbacks that cause his memory "to blank out." (R. 15). He struggles with anger issues, sadness, nervousness, and anxiousness. (R. 16-17). He described his current monthly treatment with Nelson and stated that his current medications were not helping. (R. 18). He misses appointments due to lack of energy and the lack of desire to be around others. He explained that he was identified with a learning disability and dropped out of high school due to stress, anger and memory problems. As far as daily activities, he drives around his blind companion and helps with general care. (R. 20). He needs reminders to complete daily chores. (R. 22).

A vocational expert was asked whether a person could perform work in a competitive setting if he was of Meredith's age, education and past relevant work background without exertional limitations but with the following non-exertional limitations: would have the "ability to understand and remember simple instructions and follow simple instructions," "would need to work in an environment with infrequent interaction with the public, and would work better with things than people." (R. 24). The expert said such a person could perform competitive work and testified to the available unskilled work available. Using Ms. Nelson's medical source statement, Meredith's counsel

20

asked whether there would be any work available for a person who was markedly limited in the "ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; and, . . . ability to complete a normal work day and work week without interruption from his psychologically-based symptoms." (R. 29). The expert answered there was no available work. *Id*.

As this demonstrates, the court did examine meticulously the record as a whole and included in its consideration the evidence that undercuts the ALJ's findings as well as supports them. From its review, the court is satisfied that a reasonable mind might accept the evidence here as adequate to sustain a conclusion that Meredith was not disabled.

**SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S RFC FINDING**

The ALJ recognized the plaintiff has "mental limitations" and "cognitive deficits" in finding that he "has mental restrictions and is limited to understanding, remembering, and carrying out simple tasks," "able to work better with things as compared to people" and able to "work in an environment that requires infrequent contact with people." (R. 45). The ALJ's discussion included the following:

> As noted above, the claimant has mental limitations. The claimant also has cognitive deficits, which limits the complexity of work he can perform. Moreover, he has difficulty maintaining concentration and focus, and he has difficult interacting with people. Despite these

21

difficulties, however, the claimant has been able to work at times, including work that involves interacting with the public. Obviously, the claimant should not focus on careers that involve customer service; however, his ability to work such jobs, even for short periods, shows mental abilities greater than alleged. Moreover, the claimant has shown the mental capacity to perform work that does not involve significant social interaction and his vocational rehabilitation counselor indicated that the claimant should not be precluded from work based upon his mental condition. Instead, he indicated the primary problem for the claimant was his lack of motivation and unwillingness to take basic steps, like obtaining a GED. Additionally, it is important to note the claimant's condition has been helped over the years with treatment and medication, and physicians have indicated the claimant's mental limitations are "mild to moderate", not "marked or extreme."

(R. 45). Meredith argues this RFC finding does not reflect the substantial evidence of record and is the result of the ALJ relying "too heavily on the outdated opinions of the non-examining source." (Dk. 11, p. 12).

The ALJ's decision is reviewed for being "free from legal error and supported by substantial evidence." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005). Meredith challenges the ALJ's decision to give "more weight" to the Psychiatric Review Technique ("PRT") (R. 341-354) and the Mental Residual Functional Capacity Assessment ("MRFC") (R. 355-357) completed by the non-examining agency psychologist, Dr. Witt, than to the two-page mental source statement completed by the treating ARNP, Jean Nelson (R. 622-623). Meredith contends that the medical evidence of record does not sustain Dr. Witt's opinion, that his opinion lacks a sufficient discussion to support his conclusions, and that his opinion and the opinion of the other consulting psychologist, Dr. Warrender, were given in 2008 and failed to

22

consider subsequent medical evidence, including Nelson's medical source statement-mental completed in May of 2010.

The ALJ may rely on the opinions of consulting physicians who review only medical records but never examine the claimant, but their opinions are of less weight than those from physicians who have seen the claimant for a period of time. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). The regulations further provide:

> When an administrative law judge considers findings of a State agency medical or psychological consultant . . ., the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions.

20 C.F.R. § 416.927(e)(2)(ii)(2012). The relevant factor in ¶ (c) provides in part:

> Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

§ 416.927(c). Paragraph (c) also highlights "the more consistent an opinion is with the record as a whole, the more weight" it will receive. *Id*.

The court does not find error in how the ALJ evaluated Dr. Witt's opinion. From the Valeo records, the ALJ observed that Meredith had been helped by the medication, assessments and therapy, and that his need for

23

treatment had lessened and he was employed during those periods. The ALJ

then observed:

> After a period a [sic] relatively sparse treatment, the claimant began
> seeking treatment again after he applied for Social Security benefits. He
> also began receiving vocational rehabilitation services. Although
> receiving these services, the claimant continued to struggle with
> employment. His vocational rehabilitation counselor indicated the
> claimant's primary problem was a lack of motivation and an
> unwillingness to perform basic type jobs or take the time to obtain a
> GED.

(R. 43). The ALJ then evaluated Dr. Witt's assessment that Meredith had

moderate limitations in in social functioning and in maintaining concentration,

persistence and pace but no marked limitations to prevent him from

performing simple repetitive work. It was noted that Dr. Witt had conversed

with the claimant's vocational counselor, Jim Hansen, and that Dr. Witt's

findings were affirmed by another consultant physician, Dr. Warrender, who

reassessed the claimant's medical records.

      The record shows that Dr. Witt accompanied the PRT with a page

of consultant's notes demonstrating his review and assessment of the

Meredith's medical records, including the Valeo treatment records through

2008. These notes also reference the MRFC made by Dr. Witt. The notes

support Dr. Witt's conclusion that Meredith has credible learning limitations

and has received treatment for depression, ADHD, and PTSD. They highlight

evidence supporting the conclusions that Meredith can do simple work

especially with the assistance of medications and therapy and that Meredith's

poor work history is due to "only fair follow through" at Valeo, to the lack of motivation to work, and to being focused on receiving disability like his partner with whom he lives.

The court has no difficulty accepting the Valeo records, taken as a whole, as being consistent with Dr. Witt's conclusions and the ALJ's findings. When he was compliant with his prescribed medication and regularly made his appointments, Meredith showed good progress, expressed a strong interest in maintaining steady employment, and was never discouraged by any treating source from seeking or maintaining employment. The records also include references to Meredith recognizing that employment improved his mental condition. As far as a lack of motivation to work, there is Jim Hansen's signed summary of his conversation with Dr. Witt. Additionally, the Valeo therapy records from 2007 show that Meredith was struggling with self-esteem and wanting to maintain employment and that he "impulsively quits" many jobs after six months. (R. 407). Finally, ARNP Koch in May of 2008 noted that Meredith was "focused on getting disability and does not believe he can get a job." (R. 387). Rather than being overwhelmed by Valeo treatment records, the evidence cited in Dr. Witt's notes is generally consistent with them.

The plaintiff complains that the 2001 evaluation made by Dr. Ohlde and cited in Dr. Witt's notes is not part of the administrative record. He also questions the lack of notes from Jim Hansen at Vocational Rehabilitation

25

to confirm any evaluative work or treating relationship. The plaintiff does not propose any legal objection to the missing evaluation or to the lack of supporting notes. At the hearing, Meredith was represented by counsel who informed the ALJ that the file was complete and that he had no objections to any of the exhibits. (R. 11). *See Maddox v. Astrue,* 2012 WL 5292888 at *14 (N.D. Okla. 2012) (waiver of a procedural due process argument to missing attachments). While the absence of these records is certainly relevant in evaluating Dr. Witt's opinion, this circumstance does not result in the ALJ misplacing his reliance on the consultant's opinion as the plaintiff argues.

The plaintiff next challenges the ALJ's reliance on the consulting physicians' opinions given in July and November of 2009 as improper, because they were outdated by the Valeo treatment records after those dates, the October 2009 report of psychological testing, and the mental functioning opinion of ARNP Nelson in May 2010. It is the plaintiff's position that the treatment records show his symptoms worsened after November of 2008.

The ALJ discussed Meredith's treatment at Valeo:

Progress notes from the facility reflect the claimant has deficits secondary to an attention deficit disorder and depression. The claimant also was assessed with a chronic post-traumatic stress disorder, which was related to past childhood traumas. Additionally, the claimant's history of substance abuse was noted and progress notes reflected that the claimant was still using cannabis at times. . . . The claimant's most significant problems, however, revolved around his mental condition and his post-traumatic stress disorder. But this condition as well as the claimant's overall mental problems were being helped with treatment. Progress notes reflect the claimant, although having some ups and

26

downs, was assessed consistently with GAF scores in the 60's, indicating only moderate symptomology. Moreover, progress notes reflect the claimant, although having difficulty establishing the right medication regimen, was being helped with medication. . . . The claimant also has shown himself to have an intellectual capacity greater than some testing has indicated. In August 2009, cognitive tests showed (like previous tests) low intellectual functioning; however, these scores were "not believed" and the claimant's intellectual strengths were noted, including his ability to work for a year as a customer service representative as well as his ability to use a computer and assume the caretaking duties for his life partner, who was legally blind. The claimant also was found to have the mental capacity to work and study, but it was indicated the claimant would need to study in different ways (short periods) and in a place relatively free of distractions because of his difficulties with focus. . . .

(R. 43-44). As revealed in this discussion, the ALJ considered all of Meredith's

treatment records from Valeo, including those after November of 2008. The

progress notes of record are consistent with the ALJ's findings that while

Meredith functioned better on some occasions than others and he experienced

some difficulties in arriving at the suitable levels and kinds of medication,

Meredith's GAF did not change significantly during that period and never

dropped below 60 indicating only moderate symptoms.[1]  The plaintiff does not

cite any treating source opinion stating that Meredith's mental condition had

deteriorated significantly after November of 2008 as to impact his functioning.

Nor does the psychological evaluation of October of 2009 include a finding that

the Meredith's condition had recently deteriorated or changed or that it could

---

[1] A GAF score in the range of 51 to 60 is defined as moderate symptoms or moderate difficulty, and a GAF score in the range of 61 to 70 is defined as mild symptoms or some difficulty. *Bronson v. Astrue*, 530 F. Supp. 2d 1172, 1178 n. 2 (D. Kan. 2008).

necessarily worsen over time despite medication and therapy. The same can be said about ARNP Nelson's medical source statement. The ALJ's evaluation of the treatment records, psychological evaluation and Nelson's medical source statements sufficiently shows she did not consider there to be any significant change in Meredith's condition as to require an updated assessment from the consulting physicians after an evaluation of this additional evidence.

The plaintiff argues his numerous attempts at employment over the last 15 years do not support any conclusion that he can perform full-time employment, even at the simple level. The ALJ found that Meredith "has been able to work and has shown (overall) much more capacity than he now alleges." (R. 45). At the hearing, the ALJ noted that Meredith's work history showed being hired and trained for positions which involved more skill and more frequent interaction with the public than the ALJ's RFC assessment. The evidence is conflicting over the reasons for Meredith's failure to stay employed. The court cannot say that the evidence on Meredith's lack of motivation to work, his focus on obtaining disability benefits and his general impulsivity is not overwhelmed by the other evidence of record.

The ALJ's decision demonstrates he considered the whole record, and his RFC determination is supported by substantial evidence. The medical evidence of record does not show the ALJ improperly relied on or gave excessive weight to the State agency physicians' RFC opinions. The other

evidence does not overwhelm what the ALJ cited in support of her RFC

assessment. Finally, the ALJ's finding of only moderate limitations is consistent

with the longitudinal picture painted from the whole record and is supported by

substantial evidence.

**EVALUATION OF TREATING NURSE PRACTITIONER'S OPINION**

> The court's review includes a determination whether the ALJ

followed the rule of law applicable for weighing particular types of evidence.

*Lax*, 489 F.3d at 1084. The ALJ's decision states in relevant part:

> The assessment completed Jean Nelson, Advanced Registered Nurse
> Practitioner (ARNP), in May 2010 contrasts with the above findings. Ms.
> Nelson opined the claimant had marked limitations in his ability to
> understand, remember, and carryout detailed instructions as well as
> marked limitations in his ability to maintain attention and concentration
> for extended periods or work in coordination with or proximity to others
> without being distracted by them. Furthermore, her assessment
> presented the claimant as an individual overwhelmed by mental
> problems and unable to work. . . .   As an individual who counseled the
> claimant at Valeo Behavioral HealthCare, the undersigned closely
> reviewed the findings of Ms. Nelson. Ms. Nelson, however, is not an
> acceptable medical source and the rationale she used to make her
> findings is unclear. She also did not provide objective medical or clinical
> findings to support her conclusions and progress notes from Valeo
> Behavioral HealthCare show the claimant to be more capable than found
> by Ms. Nelson. Considering these factors, Ms. Nelson's findings are given
> little weight, and they are not found persuasive. Instead, more weight is
> given to the objective and medically based findings of Dr. Witt and Dr.
> Warrender.

(R. 44). The plaintiff contends that the ALJ did not consider Nelson's opinion in

light of all relevant factors in SSR 06-03p and failed to cite specific portions of

the record establishing inconsistencies.

The ALJ correctly recognized that a nurse practitioner is not an "acceptable medical source" under the regulations. 20 C.F.R. § 404.1513(a); SSR 06-03p, 71 FR 45593, *45594, 2006 WL 2263437; *Seastrom v. Astrue*, 2012 WL 5499442 at *4 (D. Kan. 2012). The Social Security rules treat opinions from nurse practitioners as evidence from other medical sources. SSR 06-03p, 71 FR at 45594. "Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under . . . [the] rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id*. at 45595. "Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." *Id*. SSR 06-03p establishes that:

> The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

*Id*. at 45596. Factors relevant to this consideration include: the nature and extent of the source's relationship to the individual, the source's qualifications and expertise, the consistency between the source's opinion and other evidence, the source's presentation of relevant evidence in support of the opinion, the source's explanation of the opinion, and other factors tending to

support or refute the source's opinion. *Id.* at 45595. SSR 06-03p recognizes that the opinion of a medical source may outweigh the opinion of an acceptable medical source when the former "has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Id.* at 45596.

The plaintiff contends the ALJ overlooked relevant factors in assessing ARNP Nelson's opinion and generally disputes that the other evidence is inconsistent with Nelson's opinion. There is no requirement for the ALJ to identify and discuss each factor separately. SSR 06-03p explains:

> Although there is distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* at 45596. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1163 (10th Cir. 2012). "[T]he ALJ's decision is sufficient if it permits us [the reviewing court] to 'follow the adjudicator's reasoning.'" *Keyes-Zachary*, 695 F.3d at 1164 (quoting SSR 06-03p).

The ALJ adequately lays out her reasoning for giving "little weight" to ARNP Nelson's mental source statement. The ALJ acknowledged "closely reviewing" Ms. Nelson's opinion since she had counseled Meredith at Valeo. (R. 44). The ALJ observed several deficiencies with Nelson's opinion. The rationale

31

behind her findings was unclear. She had not provided "objective medical or clinical findings to support her conclusions." *Id*. The progress notes from Valeo show Meredith "to be more capable than found by Ms. Nelson." *Id*. Nelson's medical source statement was a form on which she checked boxes for both moderate and marked limitations, but she did not include a supporting narrative or supporting citations to test results, progress notes, or any other Valeo records. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1223 (10th Cir. 2004) ("such an evaluation form is insufficient to constitute substantial evidence when it stands alone and unaccompanied by thorough written reports or testimony."). This form certainly does not disclose the rationale for Nelson's assessment on the severity of Meredith's limitations.

What the plaintiff cites from the Valeo records does not show that ARNP Nelson had treated Meredith for symptoms that she had regarded as so severe as to be marked limitations. Instead, she consistently recorded a GAF of 60 which is moderate symptoms and just one point from mild symptoms. The ALJ's decision refers to Meredith's condition being helped with treatment and to the progress notes with GAF scores indicating "only moderate symptomatology." (R. 44). As summarized above, there is substantial evidence to support these findings from the Valeo records. Nelson's notes in 2007 often referred to "good progress" while Meredith was compliant with medications and therapy. (R. 381, 395, 405). In May of 2008, Nelson wrote

32

that Meredith told her the SRS had instructed him to find employment but Meredith "is focused on getting disability and does not believe he can get a job." (R. 387). Nelson also recorded that she did not "have a clear indication of whether this is true or not." (R. 387). In May of 2009, Nelson recorded a GAF of 60 and scheduled Meredith's next appointment for three months later. Based on the subsequent progress notes and testing results, the ALJ certainly could question the lack of objective medical evidence or clinical findings to sustain Nelson's later opinion.   Additionally, the consistent GAF scores and the severity of symptom ratings that other Valeo counselors and therapists recorded are not consistent with Nelson's opinion of marked limitations. The court finds no error in the ALJ's evaluation of Ms. Nelson's medical source statement.

**EVALUATION OF MEREDITH'S CREDIBILITY**

The plaintiff argues the ALJ appeared to consider only Meredith's daily activities when assessing his credibility and, in doing so, failed to recognize that the sporadic performance of certain tasks does not establish the capacity for substantial gainful employment. Credibility determinations peculiarly fall within the province of the fact finder, and these determinations are not to be upset when supported by substantial evidence. At the same time, courts should expect credibility findings to be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.

*Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). It is not within the ALJ's discretion simply to ignore evidence favorable to the plaintiff. *Owen v. Chater*, 913 F. Supp. 1413, 1420 (D. Kan. 1995).

The ALJ's analysis of such evidence need not make a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the ALJ will be deemed to have satisfied the requirements set forth in *Kepler*. *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2002); *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). Nor must the ALJ discuss every relevant factor in evaluating claimant's testimony. *Bates v. Barnhart*, 222 F. Supp. 2d 1252, 1260 (D. Kan. 2002). It is enough that the ALJ explain and support with substantial evidence which part(s) of the claimant's testimony were not believed and why. *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002). The court will not reweigh the evidence or substitute its judgment for that of the Commissioner. *Hackett v. Barnhart*, 395 F.3d at 1173.

The ALJ's findings are detailed and complete. The ALJ noticed that the plaintiff had held customer service jobs for different periods of time and that this were inconsistent with his stated inability to interact with the public. (R. 210). The ALJ observed that the plaintiff regarded his mental condition as precluding employment, yet the plaintiff's vocational rehabilitation counselor had a different opinion and believed the plaintiff's "primary problem" was a

34

"lack of motivation." (R. 45). The ALJ also observed that Valeo records showed that the plaintiff was helped with medication and treatment and that his "mental condition was manageable and not debilitating." (R. 43, 403-405). With regards to Meredith's mental health treatment, the ALJ pointed out that, "[a]fter a relatively sparse treatment, the claimant began seeking treatment again after he applied for Social Security benefits." (R. 43, 581). The ALJ contrasted the plaintiff's report of being "overwhelmed by mental problems" and unable to work with the plaintiff's ability to serve as "primary caretaker for his life partner who has been struggling with blindness." (R. 45). The ALJ highlighted from the claimant's function report his admitted abilities to meet his personal needs, prepare basic meals, perform household chores and yard work, use a computer, and pay bills. *Id.* The ALJ also looked to the psychological testing results reported in October 2009 that Meredith functioned higher than his tested level based upon his "demonstrated strengths" such as prior employment and daily living activities. (R. 44, 420). In that same regard, his profile from the MCMI testing was considered invalid because the pattern of his responses indicated the exaggeration of the severity of his symptoms. (R.525). Finally, the ALJ questioned the claimant's account of his debilitating mental limitations and conditions when he was able to be hired and work a variety of jobs.

The ALJ's credibility findings here are not conclusory but include

explanations. They do not lack specificity but point to several inconsistencies in the claimant's statements. They do not significantly lack for citations to the record. Nor do they put improper or excessive weight on the claimant's daily activities. Finding the ALJ's credibility findings to be a reasonable conclusion supported by substantial evidence, the court will not reweigh the evidence even though it might have a different conclusion in the first instance. The plaintiff has not shown a reversible error in the Commissioner's decision.

IT IS THEREFORE ORDERED that judgment be entered in accordance with the fourth sentence of 42 U.S.C. § 405 (g) affirming the Commissioner's decision.

Dated this 7th day of February, 2013, Topeka, Kansas.

s/ Sam A.Crow
Sam A. Crow, U.S. District Senior Judge